# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

_____FILED_____ _____ENTERED_____
_____LODGED_____ _____RECEIVED_____

SEP 2 9 2006

AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND

DEPUTY

|  |  |  |
|---|---|---|
| ANTHONY M. MORA | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | Civil No. PJM 05-1993 |
| | * | |
| CITY OF GAITHERSBURG, et al., | * | |
| | * | |
| | * | |
| Defendants | * | |
| | * | |

## OPINION

Anthony M. Mora has sued the City of Gaithersburg and members of the Gaithersburg City Police Department (the "City," "GCPD" or collectively "the Gaithersburg Defendants"), as well as members of the Montgomery County Police Department ("MCPD") and the Montgomery County Sheriff's Department ("MCSD"). [1]  His claims under 42 U.S.C. § 1983 and state law stem from an allegedly unlawful search and seizure and the City's subsequent refusal to return the firearms and other property seized from him.

The Gaithersburg Defendants filed a Motion to Dismiss or in the alternative for Summary Judgment.   MCPD Officer James Stadtler filed his own Motion to Dismiss or for Summary Judgment.

---

[1]   Of the members of MCPD and MCSD named in the Complaint, service of process was accomplished only as to Police Officer James Stadtler who, as will be discussed momentarily, was granted summary judgment earlier in the proceedings and is no longer in the case. Accordingly, the case is closed as to all members of MCPD and MCSD named in the Complaint.

Following oral argument on the Motions, the Court granted the Gaithersburg Defendants' Motion for Summary Judgment in part and took the remainder of the Motion under advisement. Stadtler's Motion to Dismiss was granted in its entirety.[2] The Court also took Mora's Motion for Partial Summary Judgment under advisement.

For the following reasons, the Court GRANTS what remains of the Gaithersburg Defendants' Motion for Summary Judgment, albeit for reasons different from those argued by them. Mora's Motion for Partial Summary Judgment is rendered MOOT.

---

[2]    The Complaint proceeds in four counts: Count I, a § 1983 claim styled "Warrantless Search and Seizure of Property"; Count II, a § 1983 claim styled "Deprivation of Property Without Due Process of Law"; Count III for "Trespass to Chattels"; and Count IV for "Trover & Conversion - Wrongful Taking."

Earlier in the proceedings:

The Court granted all Defendants summary judgment as to Count I of the Complaint (Warrantless Search and Seizure of Property Pursuant to 42 U.S.C. § 1983) on the ground that the search and seizure, hereinafter described, was constitutionally reasonable.

The Court granted all Defendants except the City and GCPD Chief Mary Ann Viverette summary judgment as to Count II (Deprivation of Property Without Due Process of Law Pursuant to 42 U.S.C. § 1983) on the ground that factually there was no showing that any other Defendant had participated in the detention of Mora's property beyond the initial lawful seizure. The Court deferred ruling on the Motion as to the City and Viverette on Count II.

Count III (Trespass to Chattels) and Count IV (Trover and Conversion - Wrongful Taking) also went out on summary judgment as to all Defendants except the City and Viverette, again on the ground that no other Defendant could be shown to have participated in the detention of Mora's firearms beyond the initial lawful seizure. The Court deferred ruling on the Motion as to the City and Viverette on Count III.

Stadtler's Motion for Summary Judgment was granted on the ground that it could not be shown that he had done anything more than participate in the initial lawful seizure.

**I.**

On July 23, 2002, an emergency telephone operator dispatched GCPD officers to Mora's apartment at 439 West Side Drive, Apartment # 102 in Gaithersburg.  The dispatcher informed the officers that Mora had called the "APS Healthcare Hotline" (apparently a counseling service provided by his health insurer) and indicated that he was suicidal and had weapons in his apartment. The hotline worker also told the police that Mora had made comments about workplace shootings. The officers were further advised that one of Mora's coworkers at the Montgomery County Fire Department had indicated that Mora's threats should be taken seriously.  GCPD officers were joined by units from MCPD and MCSD.

As the police approached Mora's apartment, they observed him loading luggage into a van in the parking lot of the apartment complex.  They immediately took him into custody and proceeded to search his luggage, van, and apartment.  In all, they found and seized 41 firearms, as well as firearms parts, ammunition, ammunition magazines, firearms, books, a spotting scope, and a pair of binoculars.  The seized property was taken to GCPD headquarters for safekeeping.  Mora was taken to Shady Grove Adventist Hospital for an emergency psychiatric evaluation pursuant to Md. Code Ann., Health-Gen. § 10-622, then to Potomac Ridge Center for additional treatment and evaluation. Although he was evaluated, Mora was never formally committed for treatment nor were criminal charges ever filed against him.  Sometime after the incident, Mora moved to Pennsylvania.

To this day, the City retains Mora's firearms and the related property it seized, which is what has occasioned the present suit.  The details of that detention, therefore, require elaboration.

In the wake of the July 23, 2002 incident, GCPD conducted a follow-up investigation.  By letter dated August 1, 2002, Detective Patrick Word of GCPD advised the Maryland State Police of

what had occurred and requested that Mora's "name and collector status be flagged or other appropriate action be taken by your department to ensure the safety of both law enforcement and the community at large." The State Police, however, apparently took no action. Meanwhile GCPD learned that Mora was a licensed gun collector and that the seized weapons were in compliance with applicable state and federal firearms statutes. On September 18, 2002, GCPD closed its investigation of the incident, but did so without returning the firearms to Mora.

Sometime in early 2003, Mora, through his counsel, Eric Kirchman, inquired of GCPD as to how he could go about securing the return of his firearms. Lieutenant Richard Elliot of GCPD responded, indicating that Mora would have to complete the City's "Application for the Return of Firearms," a copy of which accompanied his letter.[3] When Mora received the Application from Kirchman, he refused to fill it out on the ground that it inquired into matters that had no bearing on his qualifications to own or possess the firearms.

It does not appear that Mora made any further demands for the return of his property until April 25, 2005, when he submitted his own "Verified Application for the Return of Firearms and Other Property."[4] According to Mora, this document, which was drafted by his attorney, included all the information required for the transfer of a firearm under state and federal law. Accompanying the Verified Application was a cover letter from Attorney Kirchman addressed to GCPD Chief Viverette. The letter stated that in Kirchman's view the Verified Application "contain[ed] all of the

---

[3]       A full copy of the Application is Attachment A hereto.

[4]       Mora suggests that he made demands on GCPD before filing the Verified Application, in that he alleges that GCPD has refused to return his property "[s]ince at least the fall of 2002." He has not, however, cited any evidence of a formal demand predating the Verified Application.

4

information concerning Mr. Mora that would have to be submitted to the Maryland State Police on their Form 77R were Mr. Mora to purchase a regulated firearm from a dealer or via a private sale." Kirchman asked for a response within seven days (the time that the State Police would have to approve or disapprove an application for purchase of a firearm under Md. Code Ann., Public Safety § 5-122), "during which time [GCPD] will have an opportunity [to] conduct a background check concerning the truth or falsity of the information supplied." Finally, Kirchman's letter requested that in the event that Mora's Verified Application were not approved, GCPD should inform Mora of the reasons for disapproval and "of any administrative remedies that would be available."

On May 31, 2005, GCPD Lieutenant Chris Bonvillain sent an e-mail to Kirchman in which Bonvillain indicated that the City would attempt to have an answer for Mora the following week. On June 1, 2005, a new attorney for Mora, Howard Fezell, sent a letter to Bonvillain demanding return of the firearms. In pertinent part, the letter stated:

> Given that Mr. Mora is not legally disqualified from possessing the 41 firearms described in the six pages captioned "Receipt For Property" which are attached to this letter[,] my client demands that the city return my [sic] his property directly to him without further delay.
>
> If the city's course of action should include a refusal to return my client['s] property directly to him[,] I would expect its definitive answer to include an explanation of precisely why it is refusing to allow Mr. Mora to retake possession of the firearms seized in July 2002, with reference to any applicable state or federal statutes. I anticipate your prompt reply.

Bonvillain responded by email the following day, reiterating the City's position that Mora would first have to complete the GCPD Application:

> From the earliest we have provided Mr. Mora with our department's application for return of firearms. The questions asked in the application are relevant to the issues that need to be investigated to determine if Mr. Mora is eligible to receive the weapons. The questions address issues outlined in both state and federal law.

Bonvillain's letter also asked for "documentation that Mr. Mora is in fact the owner of the weapons," such as "[r]ecords of transfer and/or records of purchase."

Fezell responded on June 15, 2005 with a supplement to Mora's "Verified Application" which provided the proof of ownership that Bonvillain had requested.   The supplement was accompanied by a cover letter that strongly disputed Bonvillain's claim that the inquiries on the City's Application were necessary to determine whether Mora was eligible to possess firearms under state and federal law, questioning specifically the City's authority to condition return of firearms on completion of the Application:

> That [Bonvillain's contention] is a clear misstatement of law.   Neither the Public Safety Article nor Title 18 of the U.S. Code query, for example, whether a person attends [Alcoholics Anonymous], 'how often do you consume alcoholic beverages', 'do you suffer from mental illness', or 'have you ever been <u>arrested</u>' for various offenses.

> Even the Licensing Division of the Maryland State Police [the state agency with principal authority over firearms applications] could not use its grant of regulatory power under § 5-105 of the Public Safety Article to require the use of forms that ask for information not enumerated in that Article. . . .[5]

---

[5]

The letter cited and quoted the text of § 5-118 of the Public Safety Article of the Maryland Code, which sets forth the information required in a firearms application:

(b) Required information. -- A firearm application shall contain:
(1) the firearm applicant's name, address, Social Security number, place and date of birth, height, weight, race, eye and hair color, signature, driver's or photographic identification soundex number, occupation, and regulated firearm information for each regulated firearm to be purchased, rented, or transferred;
(2) the date and time that the firearm applicant delivered the completed firearm application to the prospective seller or transferor; and
(3) a statement by the firearm applicant under the penalty of perjury that the firearm applicant:
  (i) is at least 21 years old;
  (ii) has never been convicted of a disqualifying crime;
  (iii) has never been convicted of a violation classified as a common law crime and received a term of imprisonment of more than 2 years;
  (iv) is not a fugitive from justice;

6

Your Department has no legal authority to require people who seek to retake possession of their firearms to provide . . . more information than they would have to provide the Maryland State Police concerning the purchase of a regulated firearm, or to retake possession of firearms seized in connection with violations of State law. By way of example, per Criminal Procedure Article § 13-203(b) were Mr. Mora to seek the return of firearms seized by your department for a violation of State law on the wearing, carrying, or transporting of firearms[,] his "[q]ualification for possession of a handgun is the same as for sale or transfer of a handgun under §§ 5-103, 5-104, 5-118, 5-119, 5-120, 5-121, 5-122, 5-123, 5-124, 5-125, 5-126, and 5-127 of the Public Safety Article."

Since this past April your department has had a verified application from Mr. Mora including all of the personal information required by the State Police for new gun sales or that local departments can require in cases of seized firearms. That included all personal information your Department needed to conduct a background check to determine whether  he is disqualified from possessing firearms.

Despite my requests to you on June 1 and June 2, **your Department has declined to state why it believes Mr. Mora is, or may be, legally disqualified from possessing firearms.** (*Emphasis in original*).

The letter asked that GCPD respond by June 23, 2005, indicating that, if it elected not to return

Mora's firearms, it should state the reasons for its decision and indicate what administrative remedies

would be available to Mora to challenge that decision. Fezell's letter also included the applicable

---

(v) is not a habitual drunkard;

(vi) is not addicted to a controlled dangerous substance or is not a habitual user;

(vii) has never spent more than 30 consecutive days in a medical institution for treatment of a mental disorder, unless a physician's certificate issued within 30 days before the date of application is attached to the application, certifying that the firearm applicant is capable of possessing a regulated firearm without undue danger to the firearm applicant or to another;

(viii) is not a respondent against whom a current non ex parte civil protective order has been entered under § 4-506 of the Family Law Article;

(ix) if under the age of 30 years at the time of application, has not been adjudicated delinquent by a juvenile court for an act that would be a disqualifying crime if committed by an adult; and

(x) subject to § 5-119 of this subtitle, has completed a certified firearms safety training course that the Police Training Commission conducts without charge or that meets the standards that the Police Training Commission establishes under § 3-207 of this article.

state and federal forms (MSP Form 77R and ATF Form 4473 respectively) that a purchaser of

firearms in Maryland is required to complete, so that GCPD could compare the questions asked on

those forms with those asked on its form.

Bonvillain responded on June 23, 2005, reiterating the City's position that Mora had to fill

out the GCPD Application:

> I have reviewed the documentation that you have provided to us and have determined that we have not received the information that we would have obtained had your client completed our department's application for return of firearms.
>
> It is my belief that the application you have drafted is not applicable to the return of firearms that have been seized by a law enforcement agency in the interest of public safety. It is my read that the entire section of the Public Safety Article, upon which the information you submitted is based, addresses the purchase of firearms from a licensed firearms dealer. Our department's application for the return of firearms seeks relevant information to allow us to fully investigate the matter and make a proper determination. When that application is properly completed and submitted, I will ensure that an investigation is commenced and completed in a reasonable time frame.

Bonvillain's letter also suggested the possibility that the firearms might be transferred to a licensed

dealer for sale with the proceeds going to Mora, so that ultimately Mora would not be deprived of

his property interest in the firearms. Finally, the letter indicated that no further staff time would be

devoted to the matter until Mora either completed the Application or identified a licensed dealer to

take possession of the firearms.

Fezell responded on June 24, 2005. His letter once again repeated Mora's demands for the

return of the firearms, particularly that GCPD immediately return Mora's "non-firearm" property,

e.g., ammunition and ammunition magazines, a spotting scope, and the like, notwithstanding Mora's

refusal to complete the GCPD Application. Finally, the letter proposed that Atlantic Guns of

Rockville, a licensed dealer, could take possession of the firearms and "transship" them to a Federal

Firearms Licensee in Pennsylvania for $800, where Mora would have to complete an ATF Form 4473 and pass a background check before taking possession of them.

In a June 28, 2006 e-mail, Bonvillain indicated to Fezell that GCPD would return certain of Mora's property, such as spotting scopes and binoculars, but the offer did not include the firearms themselves.  On the same day, Fezell made a formal Public Information Act request to GCPD Chief Viverette, pursuant to Md. Code Ann., State Gov't §§ 10-611 *et seq.*, in which he demanded any and all records of GCPD's investigation to determine whether Mora was qualified to possess firearms.

Fezell responded to Bonvillian's e-mail by letter dated June 29, 2006, demanding again the return of all of Mora's "non-firearm" property.  The letter also recounted a phone conversation of the previous day in which Bonvillain supposedly had indicated that GCPD would not release the firearms to a local licensed dealer for transshipment to a dealer in Pennsylvania, notwithstanding the fact that Mora would have to pass a background check before the Pennsylvania dealer could turn the firearms over to him.  Fezell's letter further noted that GCPD had given no indication why it believed that Mora was disqualified from possessing firearms.  Finally, citing § 5-134(a) of the Public Safety Article, which preempts local jurisdictions from regulating the transfer of firearms, [6] Fezell again challenged the City's authority to require Mora to complete its Application.

That same day, Fezell wrote GCPD Chief Viverette and summarized his communications with Bonvillain, with the stated purpose of giving Viverette "actual knowledge" of GCPD's actions,

---

[6]
      Section 5-134(a) provides:  "This section supersedes any restriction that a local jurisdiction in the State imposes on the transfer by a private party of a regulated firearm, and the State preempts the right of any local jurisdiction to regulate the transfer of a regulated firearm."

specifically referencing the statutory preemption provision.  At that point, Mora's correspondence with GCPD came to an end.

On July 22, 2005, Mora filed his Complaint in this Court.

The Court now considers, as to the City and GCPD Chief Viverette, their Motion for Summary Judgment relating to:

(1)   their liability *vel non* for Mora's § 1983 claim of wrongful deprivation of property without due process (Count III); and

(2)   their liability *vel non* for Mora's claim of trespass (Count III) and trover and conversion (Count IV).

The Court also considers:

(3)   Mora's Motion for Partial Summary Judgment in which he seeks an injunction ordering the return of his firearms and related property.

## II.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex v. Catrett*, 477 U.S. 317, 322 (1986).  The burden is on the moving party to demonstrate the absence of any material issue of fact. *Celotex*, 477 U.S. at 323.  Once the moving party satisfies his initial burden, the non-moving party "may not rest upon [his] allegations," but must present evidence demonstrating the existence of a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court is obliged to view the facts and inferences drawn from the facts in the light most favorable to the non-moving party. *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  However, the non-moving party cannot create a genuine issue of material fact through mere speculation or by piling one inference upon another. *Collier v. Service Am. Corp.*, 934 F. Supp. 168, 171 (D. Md. 1996).  A mere scintilla of evidence supporting the non-movant's case is insufficient. *Anderson*, 477 U.S. at 248.

### III.

The Gaithersburg Defendants seek summary judgment as to Count II, Mora's § 1983 due process claim, on the ground that he has been afforded due process because he has been offered the opportunity and has refused to complete GCPD's Application for the Return of Firearms.  The Court agrees that Defendants are entitled to summary judgment on this claim, but not for the reasons that they argue.

Count II alleges that the City has deprived Mora of his property interest in his firearms and related property without due process of law.[7]  It is not clear whether Mora intends his claim to sound in procedural due process, substantive due process, or both.  To state a claim for violation of procedural due process rights, Mora must show (1) that he has a property interest in his firearms and related items; (2) that the City deprived him of that interest; (3) and that it did so without due process of law. *See Sunrise Corp. v. City of Myrtle Beach*, 420 F.3d 322, 328 (4th Cir. 2005) (citation omitted).  To state a claim for violation of substantive due process rights, Mora must show (1) the same property interest; (2) the same deprivation; and (3) that the City's "action falls so far beyond the outer limits of legitimate governmental authority that no process could cure the deficiency." *Id.*

---

[7]        The City does not dispute that official policy is in play, such that it will be liable if Mora's due process rights were violated. *See Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 690 (1978).

11

(citations omitted).  Substantive due process is a narrower concept than procedural due process; it covers only those actions "so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies." *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 827 (4th Cir. 1995).

Whatever the nature of Mora's due process claim, it rests on two fundamental contentions: 1) that he is not legally disqualified from possessing or owning a firearm under state and federal law; and 2) that, because the City is preempted from regulating firearms, it must return the firearms if he is legally qualified to possess or own a firearm under state and federal law, i.e., the City cannot impose requirements additional to those under state and federal law.  The Court examines these two contentions.

As to the first, while the City does not concede that Mora is legally qualified to possess and own a firearm under state and federal law, it does not really dispute the point.  Indeed, the City has provided no evidence that he is *disqualified*.  Rather, the City says that it is unable to make a determination as to Mora's qualifications until he completes its application.  Mora, in response, argues that by virtue of his Verified Application for Return of Regulated Firearms and the supplement to it, he has provided the City with all the information it needs to determine his qualifications under state and federal law.  This suffices, he says, because the City is preempted from imposing any requirements in addition to what state and federal law require.  In other words, if Mora is qualified to own and possess a firearm under state and federal law, the City must return his firearms *instanter*.  Mora points out that, in any event, the City conducted a background check on him during the investigation immediately following the seizure of his firearms, and that this

background check revealed that he was not disqualified under state or federal law. Nonetheless, citing "public safety" concerns, the City persists in refusing to make any determination in the matter until Mora completes the form that it has assembled.

As to Mora's second fundamental contention, the City argues that state law in fact does not preempt it from requiring him to complete its Application as a condition of returning his firearms.

The Court considers the applicable law.

### IV.

The Maryland Code contains four separate provisions that preempt the authority of local jurisdictions to regulate firearms.

### A.

Section 4-209 of the Criminal Law Article "preempts the right of a county, municipal corporation, or special taxing district to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of: (1) a handgun, rifle, or shotgun; and (2) ammunition for and components of a handgun, rifle, or shotgun." Md. Code Ann., Crim. Law § 4-209(a). The section provides limited exceptions: A local jurisdiction may regulate: (1) "with respect to minors"; (2) "with respect to law enforcement officials of the subdivision"; and (3) "within 100 yards of or in a park, church, school, public building, and other place of public assembly." *Id.* § 4-209(b)(i).

### B.

Section 5-104 of the Public Safety Article displaces any local restrictions on the sale of regulated firearms: "This subtitle ["Regulated Firearms"] supersedes any restriction that a local

jurisdiction in the State imposes on a sale of a regulated firearm, and the State preempts the right of any local jurisdiction to regulate the sale of a regulated firearm."

## C.

Sections 5-133 and 5-134 of the Public Safety Article are more specific.   The former preempts local regulation of possession of firearms; the latter preempts local regulation of their sale, rental or transfer.

## V.

The City submits that none of these provisions apply in the present case.

## A.

It begins by arguing that § 4-209 only preempts the "regulation" of  firearms whereas GCPD's policy regarding the return of firearms duly seized is not "regulation." The Court examines the statute.

Section 4-209(a) of the Criminal Law Article , entitled, significantly, "Regulation of weapons and ammunition," preempts the right of a . . . municipal corporation . . . to regulate the . . . ownership [and] possession of "a handgun, rifle or shotgun; and ammunition for and components of a handgun, rifle, or shotgun." As an initial matter,

> It is well-settled that a statute is itself the best evidence of its meaning. . . . Therefore, where statutory language is clear and unambiguous, according to its ordinary and commonly understood meaning, . . . a court must so construe the statute, rather than resort to legislative history or other extraneous considerations to arrive at a contrary construction.

*Total Audio-Visual Sys., Inc. v. Dep't of Labor, Licensing and Regulation*, 360 Md. 387, 395, 758 A.2d 124, 128 (Md. 2000).  "A dictionary is a starting point in the work of statutory construction, but not necessarily the end . . . [I]t cannot always be counted on to give the complete answer to a

problem of interpretation . . . It requires careful study of the context of a word." *Morris v. Prince George's County*, 319 Md. 597, 606, 573 A.2d 1346, 1350 (Md. 1990).

Since the City contends in this case that its withholding of the firearms is not "regulation" within the meaning of the statute, the Court looks first to the dictionary definition of the word "regulation." *Webster's Encyclopedic Unabridged Dictionary of the English Language* (1994) defines the term in relevant part as "the act of regulating." "Regulating" in turn means "to control or direct by a rule, principle, method, etc." Inasmuch as it is "possession" that Mora says the Defendants are regulating, the meaning of the word "possession" is also significant. *Webster's* defines that term as "the act or fact of possessing" and in turn defines "possess" in relevant part as "to have as belonging to one; have as property." "Have," for good measure, means "to possess; own; hold for use; contain."

There can be little doubt that, literally applied, § 4-209 precludes a municipal corporation such as the City and its minions from imposing, by any method, rule, principle, policy or practice, its own requirements with regard to Mora having and holding firearms that the federal and state government have licensed him to have and hold. This is not to say that the City or GCPD would be powerless to act – including seizing and detaining firearms – if an otherwise properly licensed individual were committing or probably had committed a weapons-related crime. That obviously is something GCPD can do and indeed is what the City did do when its police were sent out by the emergency dispatcher to Mora's apartment on July 23, 2003. But that is not what is at issue here. Mora has been charged with no crime, weapons-related or otherwise. Nor has he, since immediately following July 23, 2003, been detained on the basis of having a suspected mental disorder, been adjudicated in need of inpatient care or treatment, or been found to be a danger to the life or safety

of himself or others. Section 10-619 of the Health-General Article of the Maryland Code provides for involuntary admissions to a mental health facility of an individual who exhibits characteristics such as those, something GCPD clearly understood back in July 2003, when it sought to have Mora involuntarily committed, albeit unsuccessfully.

Yet nothing more than GCPD's subjective opinion, based on Mora's original threatened suicidal episode in 2002, informs its belief that it has the authority to keep a hold on his firearms unless and until he satisfies it by answering questions beyond what the State requires of him to legally possess the firearms. While as a general proposition GCPD's concern for public safety may not be unreasonable, the question before the Court is whether GCPD – as opposed to the Maryland State Police, which for some reason has declined to act in this case – has the authority to act.[8] By extension, the question is whether the City – which has clearly embraced if not initiated GCPD's policy that it may act "in the interest of public safety" when it comes to the return of firearms that it has initially seized – may act. It is no different than if the City had passed a specific ordinance to similar effect. The question before the Court remains one of state preemption, and, as to that, the words of § 4-209 of the Criminal Law Article "clearly and unambiguously" indicate that GCPD and the City's policy are preempted by state law.

---

[8]

   Presumably the State Police, which has licensing authority over firearms in the State, *see* Md. Code Ann., Pub. Safety §§ 5-105 (authorizing Secretary of State Police to adopt regulations for firearms), 5-122 (authorizing Secretary to disapprove firearms applications), could, after hearing, revoke a license to possess firearms if, after appropriate hearing and findings, the licensee were deemed to present a danger to himself or others. Although no express statutory provision appears to authorize the revocation of firearm licenses in Maryland, the great weight of authority suggests that, as to licensing in general, in the absence of a constitutional limitation, a licensing authority has inherent power to withdraw a license once granted, particularly on the basis of such causes as would render the licensee unfit to engage in the licensed activity in the first place. *See generally* 51 Am. Jur. 2d *Licenses and Permits* §§ 88-95 (collecting cases).

Nonetheless, if context is needed beyond plain meaning, there is context to be had.

A 1991 opinion of the Maryland Attorney General recounts the history of a Friendship Heights Village Council regulation that would have banned the possession of all ammunition in that special tax district, as well as companion legislation of the Montgomery County Council and contemporaneous efforts in the Legislature to occupy virtually the entire field of weapons and ammunition regulation. *See generally* 76 Op. Md. Atty Gen. 240 (December 17, 1991). After the Village and County Council legislation was deemed preempted by the Attorney General and the Montgomery County Circuit Court, bills offered in the Maryland Senate and House sought to remove entirely any local authority to regulate weapons and ammunition, including but not limited to their "possession." Governor Hughes, as it happens, vetoed the bills, stating that "while he understood that the premise underlying the legislation was to provide greater statewide uniformity in weapons regulation, the broad sweep of the bills raised the possibility that they would 'invalidate beneficial existing local legislation without any corresponding statewide substitute and, contrary to the sponsor's intent . . . undermine public safety.'" *Id.* at 245.

Following the veto, therefore, compromise legislation was enacted that "broadly pre-empted local regulation of firearms but excepted from the scope of preemption, among other things, regulation 'with respect to minors.'" *Id.* at 246. The Governor signed the Senate bill. [9] As the Attorney General opined thereafter, "predecessor legislation . . . would have preempted virtually all local regulation of firearms, ammunition and explosives . . . Among those compromises was the

---

[9]

The law was eventually codified as Article 27, § 36H of the Maryland Code, the forerunner of § 4-209 of the Criminal Law Article.

creation of a specific exception to the general preemption rule, to allow local governments to regulate weapons and ammunition with respect to minors." *Id.* at 247 (*Emphasis added*).[10]

In light of this history, there can be no doubt that the exceptions to otherwise blanket preemption are narrow and strictly construable. State law has so thoroughly and pervasively covered the subject of firearms regulation and the subject so demands uniform state treatment, that any non-specified regulation by local governments is clearly preempted. *See Talbot County v. Skipper*, 329 Md. 481, 620 A.2d 880 (Md. 1993). That includes the City's efforts to add its own informational requirements to the requirements that the state and federal authorities already impose on possession of firearms.

**B.**

The weakness of Defendants' other arguments that there is no preemption only fortifies the conclusion that there is preemption.

The City argues that Subtitle 5 of the Public Safety Article ("Regulated Firearms") is entirely inapplicable where one seeks the return of firearms from a law enforcement agency, which is what GCPD Lieutenant Bonvillain posited in his June 23, 2005 letter to Fezell:

> It is my belief that the application you have drafted is not applicable to the return of firearms that have been seized by a law enforcement agency in the interest of public safety. It is my read that the entire section of the Public Safety Article, upon which the information you submitted is based, addresses the purchase of firearms from a licensed firearms dealer.

---

[10] The City also seeks to justify its actions in this case on the ground that under Article 23A, § 2(b)(10) of the Maryland Code, it has express power to "control the use and handling of dangerous and explosive materials, and to prevent the firing of any firearms or other explosive instrument." This argument does not advance the City's cause. This case does not involve explosive materials, nor does it implicate the City's authority to regulate the discharge of firearms, which in fact, the Legislature has expressly stated is not preempted. *See* Md. Code Ann., Crim. Law § 4-209(d).

In support of this argument, the City cites § 5-103 of the Public Safety Article, which reads:

> This subtitle ["Regulated Firearms"] does not affect:
> (1) a sale or transfer for bona fide resale in the ordinary course of business of a licensee; or
> (2) a sale, rental, transfer, or the use of a regulated firearm by a person authorized or required to do so as part of the person's duties as a member of:
> (i) an official police force or other law enforcement agency;
> (ii) the armed forces of the United States, including all official reserve organizations; or
> (iii) the Maryland National Guard.

Defendants urge that, under § 5-103, transfers to law enforcement officers are excepted from the provision and that therefore local regulation of a "transfer" of firearms to the local jurisdiction by an individual such as Mora is excepted from preemption.[11]   This argument is flawed in several respects.

In the first place, it is apparent that § 5-103 deals with the sale, rental or transfer of firearms by law enforcement <u>personnel</u>, not regulation of the possession of firearms by law enforcement <u>agencies</u>.   The statute speaks in terms of "<u>person</u>[s] authorized or required to do so [*i.e.* transfer firearms] as part of the person's duties <u>as a</u> <u>member</u> <u>of</u> a law enforcement agency" (*Emphasis added*).   There is no mention of law enforcement agencies in general.[12]

---

[11]

The City also argues that since § 5-104 only preempts local restrictions on <u>sales</u> of firearms, the entire Subtitle is inapplicable.   That is clearly not the case, since the Subtitle also preempts restrictions on the <u>possession</u> and <u>transfer</u> of firearms by a private party.   *See* Md. Code Ann., Public Safety §§ 5-133(a), 134(a).

[12]

This reading draws additional support from the presence of similar carve-outs in other sections of Subtitle 5.   *See* Md. Code Ann, Public Safety § 5-102 ("This subtitle does not apply to: . . . (4) law enforcement personnel of any unit of the federal government, members of the armed forces of the United States or the National Guard, or law enforcement personnel of the State or any local agency in the State, while those personnel or members are acting within the scope of their official duties . . . ."); § 5-119 ("A firearm applicant is not required to complete a certified firearms

In addition, had the Legislature intended to provide an exception from preemption for transfers of firearms to and from local law enforcement agencies, it clearly knew how to do so. Again, the Code's principal preemption provision, § 4-209 of the Criminal Law Article, "preempts the right of a county, municipal corporation, or special taxing district to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of: (1) a handgun, rifle, or shotgun; and (2) ammunition for and components of a handgun, rifle, or shotgun," but provides exceptions for regulation: (1) "with respect to minors"; (2) "with respect to law enforcement *officials* of the subdivision"; and (3) "within 100 yards of or in a park, church, school, public building, and other place of public assembly." (*Emphasis added*). There is no exception for local law enforcement agencies in general nor is there one that would embrace regulation of the return of seized firearms by such agencies to private parties. The reasonable inference is that the Legislature never intended such an exception.

Further, the City's interpretation of § 5-103 of the Public Safety Article is at odds with the provisions establishing who is legally qualified to own and possess firearms. Sections 5-133 and 5-134 of the Public Safety Article, which govern qualifications for possession and sale, rental, or transfer respectively, set out a series of disqualifiers that leave little to discretion:

---

training course required under §§ 5-118 and 5-134 of this subtitle if the firearm applicant: . . . (2) is a law enforcement officer of the State or any local law enforcement agency in the State; (3) is a member, retired member, or honorably discharged member of the armed forces of the United States or the National Guard . . .").

Mora gives a more plausible reading to the exceptions under § 5-103, suggesting that it does no more than exempt police departments and members of the armed forces and National Guard from having to submit paperwork to the Maryland State Police and await the results of a background check every time they are issued a service pistol or firearm for use in the scope of their official duties.

A person may not possess a regulated firearm if the person:

(1) has been convicted of a disqualifying crime;

(2) has been convicted of a violation classified as a common law crime and received a term of imprisonment of more than 2 years;

(3) is a fugitive from justice;

(4) is a habitual drunkard;

(5) is addicted to a controlled dangerous substance or is a habitual user;

(6) suffers from a mental disorder as defined in § 10-101(f)(2) of the Health-General Article and has a history of violent behavior against the person or another, unless the person has a physician's certificate that the person is capable of possessing a regulated firearm without undue danger to the person or to another;

(7) has been confined for more than 30 consecutive days to a facility as defined in § 10-101 of the Health-General Article, unless the person has a physician's certificate that the person is capable of possessing a regulated firearm without undue danger to the person or to another;

(8) is a respondent against whom a current non ex parte civil protective order has been entered under § 4-506 of the Family Law Article; or

(9) if under the age of 30 years at the time of possession, has been adjudicated delinquent by a juvenile court for an act that would be a disqualifying crime if committed by an adult.

Md. Code Ann., Public Safety § 5-133(b).[13]

While these provisions may use terms that suggest some latitude for the decisionmaker, *e.g.*, "Habitual drunkard" and "habitual user," there is in fact a definitional section in Subtitle 5 that gives specific content to those terms. The authorities are not left to their subjective judgment as to whether a person is an "habitual drunkard" or "habitual [drug] user;" they are confined to determining whether the person has been convicted of certain alcohol and drug offenses certain of which must have occurred within definite time periods. *See id.* § 5-101(l), (m). Similarly, a person who "suffers from a mental disorder" must (1) have a "mental illness that so substantially impairs the mental or emotional functioning of an individual as to make care or treatment necessary or advisable for the

---

[13] The disqualifiers in § 5-134 are, in pertinent part, the same.

welfare of the individual or for the safety of the person or property of another," Md. Code Ann., Health-Gen. § 10-101(f)(2) and (2) must have "a history of violent behavior against the person or another." Md. Code Ann., Public Safety § 5-133(b)(6). To a considerable extent, therefore, these provisions are non-discretionary. A person cannot be disqualified from owning or possessing a firearm even if the State Police subjectively believe that he drinks too much or is quirky or irresponsible or untrustworthy. Yet that is precisely the discretion that the City, whose authority to act is nowhere to be found, claims for its police. It maintains that the state law provisions governing a person's qualifications to own and possess firearms do not apply where firearms, in Bonvillain's words, "have been seized by a law enforcement agency in the interest of public safety." But there is no catch-all provision for detaining otherwise duly licensed firearms based on generalized concerns about "public safety" in § 5-133 or § 5-134, particularly insofar as local governments are concerned. The City has simply grafted its own qualifications on the list of qualifications established by and made exclusive by State law.

Finally, the City's argument that Subtitle 1 of Title 5 does not apply to the return of seized firearms conflicts with § 13-203 of the Criminal Procedure Article, which governs the return of a handgun where law enforcement officers have seized a handgun *inter alia* possessed in violation of the provisions of Title 5, Subtitle 1 of the Public Safety Article. Section 13-203 provides that "[b]y an appropriate inquiry and investigation, the seizing authority shall attempt to identify and locate the owner of a handgun that is seized," and that "[q]ualification for possession of a handgun is the same as for sale or transfer of a handgun under §§ 5-103, 5-104, 5-118, 5-119, 5-120, 5-121, 5-122, 5-123, 5-124, 5-125, 5-126, and 5-127 of the Public Safety Article." *Id.* § 13-203(a)(1), (b)(2). While the City fails to discuss this provision, it is clear that it knows that Mora is the owner of one or more

handguns and that he has been qualified to possess them pursuant to Title 5, Subtitle 1, of the Public Safety Article.[14]

The City's argument that the questions to which Mora objects "are not necessarily intended to disqualify any applicant based upon the answers he provides"[15] serves it no better.   If the City concedes, as it must, that it is powerless to do anything if an applicant's answers to those questions are not to its liking, *e.g.*, it may not refuse to return the firearms even if Mora tells them that he attends Alcoholics Anonymous, then one may fairly wonder what the point is of asking the questions in the first place.   The City is in error in arguing that these questions are "relevant to" Mora's eligibility to possess firearms and therefore permissible.   However relevant and interesting the question may be, the issue remains -- are the questions legally relevant to his eligibility and may a municipality such as the City or its police department make that determination?

The Court concludes that the City is preempted from imposing requirements in addition to those that Mora is required to meet under state and federal law, including requiring him to answer the questionnaire it has formulated.   That said, denial of Defendants' Motion for Summary Judgment

---

[14]

> Section 13-203 of the Public Safety Article also provides a ready rejoinder to the City's argument that preemption of local regulation regarding the return of seized firearms "would prevent local police departments from [having] procedures in place to determine whether they can lawfully return firearms to a person and whether the person is lawfully entitled to posses the firearms." That is precisely what Section 13-203 does. It spells out the procedure for local departments to follow in that respect.

[15]

> The City notes that the questions on its Application are designed not only to determine whether *the applicant can lawfully possess* the firearms, but whether *the City can lawfully return* them. However, the City does not explain how the questions in the Application bear on the latter question. Presumably the City's return could be unlawful if it gave the firearms to someone other than their licensed owner, but that is not what is at issue here.

does not automatically follow.  Since violation of state law, without more, does not amount to a due process violation, the Court must engage in further analysis.  *See Sylvia Dev. Corp.*, 48 F.3d at 829.

## VI.

This suit involves a claim for denial of procedural and/or substantive due process.

As to procedural due process, the City does not dispute that Mora has a property interest in the firearms and that it has deprived him of that interest, the first two elements of a procedural due process claim.  *See Sunrise Corp.,* 420 F.3d at 328.  The critical question is whether Mora has been afforded due process with regard to the deprivation.

The City submits that, because it has given him two reasonable alternatives -- (1) fill out the City's Application or (2) refuse to fill out the Application and receive the proceeds when the firearms are sold[16] -- it has provided him with whatever process is due.  Mora says that, by exceeding its authority under state law, the State has offended his due process rights.

## A.

Procedural due process, insofar as deprivation of property is concerned, requires notice of the proposed official action and a reasonable opportunity to contest it.  *Mathews v. Eldridge,* 424

---

[16]     Defendants invite the Court's attention to *Serio v. Baltimore County*, 384 Md. 373, 863 A.2d 952 (Md. 2004), in support of the proposition that, as an alternative to Mora answering their questionnaire, he can accept their offer to deliver Mora's firearms to a licensed dealer for sale, remitting to him the proceeds.  Apart from being beyond the City's authority to insist upon this Hobson's choice, the City has grossly misread *Serio*.  Serio was a convicted felon as to whom, for that reason, the Maryland Court of Appeals held that seized firearms could properly be retained by the County.  But the court also held that while Serio no longer had a possessory right in the firearms, he continued to have an ownership right and that, by retaining the property without providing just compensation (through sale of the property), the county had denied him due process.  Mora, however, is not a convicted felon nor is there any provision of Maryland law that permits Defendants to hold his property – or to condition its return – on his answering questions that go beyond what pre-emptive state law requires.

U.S. 319, 348 (1976); *see also Amsden v. Moran*, 904 F.2d 748, 753 (1st Cir. 1990). This means an

opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Mango*,

380 U.S. 545, 552 (1965). "[D]ue process is flexible and calls for such procedural protections as the

particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

Judge James R. Miller of this Court in *Davis v. Fowler*, 504 F. Supp. 502 (D. Md. 1980),

summarized the relevant considerations with regard to the process due when a police department in

this State is alleged to have wrongfully detained seized property:

> It is fundamental that due process requires that a property interest not be divested
> finally without some kind of hearing. The kind of a hearing that is required in any
> given case is determined by balancing the interests at stake. The considerations to
> be weighed were set forth in *Mathews v. Eldridge*. Justice Powell stated: 'First, the
> private interest that will be affected by the official action; second, the risk of an
> erroneous deprivation of such interest through the procedures used, and the probable
> value, if any, of additional or substitute safeguards; and finally, the Government's
> interest, including the function involved and the fiscal and administrative burdens
> that the additional or substitute procedural requirement would entail.'

504 F. Supp. at 506 (citations omitted); *see also Serio v. Baltimore County*, 115 F. Supp. 2d 509, 516

(D.Md. 2000) (applying due process inquiry to seizure of firearms). "Procedural due process" is "a

guarantee of fair procedure." *Zinermon v. Burch*, 494 U.S. 113, 124 (1990). Significantly, whether

the deprivation was erroneous is beside the point. *See Carey v. Piphus*, 435 U.S. 247, 266 (1978).

In this case, Mora does not complain that he received no notice of Defendants' decision to

detain his property. What he objects to is the process that they have offered him. It is, he says,

beyond their authority to insist upon. But "[w]hen a complainant alleges violations of procedural

due process and asserts that those violations are cognizable under Section 1983, the existence of state

remedies becomes highly relevant." *Amsden v. Moran*, 904 F.2d at 755 (citing *Zinermon*, 494 U.S.

at 124). A reviewing court must therefore examine "the procedural safeguards built into the statutory

or administrative procedure . . . effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law." *Id.* The availability of judicial review is an especially salient consideration in situations where permits and licenses have been denied or revoked by state or local authorities in alleged derogation of procedural due process. *See, e.g.*, *Cloutier v. Epping*, 714 F.2d 1184, 1192 (1st Cir. 1983); *Roy v. City of Augusta*, 712 F.2d 1517, 1523 (1st Cir. 1983).

In this case, the Court has concluded that Defendants have exceeded their authority under state law in detaining Mora's property. Even so, it is clear that at all times Mora has had recourse to Maryland's circuit courts and/or its district courts to secure return of his property; in either forum he has been fully able to put forth his claim that Defendants lack authority to condition return of the property on his responding to their questions and that they should deliver the property forthwith. Section 1-203 of the Criminal Procedure Article of the Maryland Code contains this provision, albeit under the rubric of "Search Warrants":

> (d)   *Return of property rightfully taken and wrongfully withheld.* – (1) A circuit court judge or District Court judge shall cause property rightfully taken under a search warrant to be restored to the person from whom it was taken if, at any time, on application to the judge, the judge finds that the property is being wrongfully withheld after there is no further need for retention of the property.
>
> (2)   The judge may receive an oral motion made in open court at any time making application for the return of seized property if the application for return is based on the ground that the property, although rightfully taken under a search warrant, is being wrongfully withheld after there is no further need for retention of the property.
>
> (3)   If the judge grants the oral motion described in paragraph (2) of this subsection, the order of the court shall be in writing and a copy of the order shall be sent to the State's Attorney.
>
> (4)   Court costs may not be assessed against the person from whom the property was taken if:

> (i) the judge denies the oral motion and requires the person from whom the property was taken to proceed for return of the seized property by petition and an order to show cause to the police authority wrongfully withholding the property; and
>
> (ii) it is later ordered that the property be restored to the person from whom it was taken.

It can hardly be the case that an individual whose property was rightfully seized under a warrant and thereafter wrongfully detained would have access to a reasonable post-deprivation remedy for its return, while an individual whose property was seized without a warrant but pursuant to a valid search incident to an arrest or a consent search would have none.  More to the point, it would be altogether anomalous that a party whose property was seized without a warrant would only have recourse to a federal civil rights action to vindicate his claim.  In the end, warrantless searches validly conducted pursuant to a recognized exception to the warrant requirement essentially equate to searches conducted pursuant to a warrant.  Certainly Maryland circuit courts, in the exercise of their general jurisdiction, Md. Code Ann., Cts. & Jud. Proc. § 1-501, or district courts in the exercise of their replevin jurisdiction, *id.* § 4- 401(2), could entertain Mora's claim and order immediate return of the detained property rightfully taken and wrongfully detained.  All this is to say that, from the outset, prompt judicial review has been available to Mora, to consider his options, but "[f]or his part . . . , [he has] found it unnecessary even to enter upon, let alone travel the entire length of, that road." *Amsden v. Moran*, 904 F.2d at 755.  Because this avenue has been open (and still remains open), Mora cannot plausibly maintain that he has been denied the procedural process due him under the Constitution, even if Defendants have incorrectly acted beyond their authority.

**B.**

As for the substantive aspect of his due process claim, Mora fares no better. As noted earlier, "substantive due process" is "narrow and covers only state action which is so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies." *Sylvia Dev. Corp.*, 48 F.3d at 827. The fact that a governmental decisionmaker may misapply state law and even make demands which exceed its authority under relevant state statutes does not necessarily implicate substantive due process. *Cf. Creative Env't v. Estabrook*, 680 F.2d 822, 832, n.9 (1st Cir. 1982), *cert. denied* 459 U.S. 989 (1982). More is needed. The action must be "arbitrary" and "irrational" under *Sylvia* or, as some courts have said, "egregiously unacceptable, outrageous or conscience-shocking." *Amsden*, 904 F.2d at 754. Municipal police have a right, indeed a duty, to seize firearms when the possessor – even if fully licensed – acts in a threatening manner. They may also detain the firearms for a reasonable period thereafter, at least until criminal charges or some sort of commitment of the individual come about. Moreover, local police officials may entertain understandable continuing concerns about public safety when the possessor of the firearms has manifested questionable dependability with respect to the possible use of the firearms in the past. Requiring such an individual to answer questions probing his continuing dependability to possess the firearms is not "arbitrary," "unreasonable," "egregiously unacceptable, outrageous, or conscience-shocking," even if it happens that the local police department lacks the authority to insist that answers be given. In sum, nothing in the present case suggests conduct on the part of Defendants as would rise to the level of a substantive due process deprivation. Even "bad faith refusal to follow state law in . . . local . . . matters simply does not amount to a deprivation of due

process where the state courts are available to correct the error." *Chiplin Enter., Inc. v. City of Lebanon*, 712 F.2d 1524, 1528 (1st Cir. 1983).

Whether Defendants' actions in this case were proper is strictly a matter of Maryland law which, to be sure, in the Court's view establishes their impropriety. But the state has always given Mora a clear pathway to have Defendants' actions reviewed. He remains free to travel that path. Wrongly detained though his firearms may have been, he has shown no constitutional deficiency, procedural or substantive, in connection with that detention.

Defendants are entitled to summary judgment on Count II of the Complaint.

## VII.

The Court turns to Mora's state law claims for trespass to chattels (Count III) and conversion and trover (Count IV).

Defendants argue that these claims are barred due to Mora's failure to comply with the notice requirements of Maryland's Local Government Tort Claims Act, Md. Code Ann., Cts. & Jud. Proc. §§ 5-301 *et seq.*, and that, in any case, the City of Gaithersburg Defendants enjoy immunity from suit. Only the latter argument need be addressed because it is dispositive.

Under Maryland law, the City of Gaithersburg as a municipality has governmental immunity and is only liable for tortious conduct which occurs in the exercise of a "proprietary" or private function as opposed to a "governmental" function. *Austin v. City of Baltimore*, 286 Md. 51, 53, 405 A.2d 255, 256 (Md. 1979). The Local Government Tort Claims Act contains no specific waiver of governmental immunity when a governmental entity is sued in its own capacity. *Khawaja v. City of Rockville*, 89 Md. App. 314, 598 A.2d 489 (Md. Ct. Spec. App. 1991). Moreover, insofar as the municipality may be liable under the doctrine of respondeat superior for the tortious conduct of its

employees which occur in the scope of their employment, since the municipality's liability is derivative, immunity of the employee precludes recovery from the employer-municipality. *Austin*, 286 Md. at 53, 405 A.2d at 256.   Apart from this, government employees in Maryland enjoy their own limited statutory immunity from liability for what, if non-government employees were involved, would be actionable tortious contact.   Under § 5-507(b)(1) of the Maryland Code, Courts and Judicial Proceedings Article:

> An official of a municipal corporation, while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as an official or individual from any civil liability for the performance of the action.

*See also Davis v. Muse*, 51 Md. App. 93, 441 A.2d 1089 (Md. Ct. Spec. App. 1982).

The operation of a police force is quintessentially a governmental function. *Williams v. Prince George's County*, 157 F. Supp. 2d 596, 604 (D.Md. 2001).   Accordingly, the City of Gaithersburg, insofar as it has been sued directly, possesses governmental immunity as to common law tort claims based on torts committed by its police officers.   Police, moreover, in the line of duty, act with discretionary authority.   *See, e.g.*, *Richardson v. McGriff*, 361 Md. 437, 518, 762 A.2d 48, 92 (Md. 1999) ("Because the exercise of discretionary force is inherent in the everyday duties of a police officer, we have long recognized that police officers are not subject to traditional tort liability . . .").   In the present case, GCPD at all relevant times has acted in its discretionary capacity, even if it has acted *ultra vires*.   However, beyond mere assertion in the Complaint, the record is devoid of any evidence that GCPD acted with the <u>malice</u> required to lift its statutory immunity.   Actual malice, insofar as GCPD is concerned, means that it acted with ill will, improper motivation, unlawful motive or evil purpose. *Davis v. Muse*, 51 Md. App. at 101, 441 A.2d at 1093.   GCPD may

have acted without lawful authority, but statutory immunity protects it from liability for its actions, so long as there was none of the ill will, improper motive or the like behind its improper assertion of authority. The Court finds that GCPD Chief Viverette, the only remaining individual Defendant, has statutory immunity from liability for the common law torts of trespass, trover and conversion. Derivatively, so does the City of Gaithersburg.

## VIII.

Finally, the Court turns to Mora's Motion for Partial Summary Judgment on Count II in which he seeks permanent injunctive relief in the form of an order directing the City to return his firearms. As previously discussed, this remedy remains available to him in state court pursuant to state law.

However, since there is no viable § 1983 claim as to which injunctive relief might attach, nor any viable state law claim in trespass, trover or conversion to which it might attach, there is no basis for this Court, as an alternative forum, to grant the injunctive relief he seeks. This claim belongs in state circuit or district court. There Mora may lay claim to his property. There he may proffer that this Court's interpretation of questions of state preemption and immunity law is sufficiently accurate that Defendants should be made to return his property forthwith, without requiring him to furnish the information the Defendants insist upon.

In this forum, however, Plaintiff's Motion for Partial Summary Judgment is MOOT.

With that, and with the grant of what remains of Defendants' Motion for Summary Judgment, the case in this Court is at an end.[17]

---

[17]

Defendants' Motions to Dismiss are rendered MOOT.

A separate Order will ISSUE.

/s/
_____
**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**September** 29 **, 2006**